UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| A.F., Individual,<br><br>           **Plaintiff,**<br><br>    v.<br><br>**WYNDHAM HOTEL & RESORTS, INC.; TRAVEL + LEISURE CO.; WYNDHAM HOTEL GROUP, LLC; JIMMY AND SONIA BARONA; and BRE/ESA PROPERTIES LLC,**<br><br>           **Defendants.** | **Case No. 1:25-cv-1451**<br><br>**DEMAND FOR JURY TRIAL** |

## PLAINTIFF'S COMPLAINT

COMES NOW, the Plaintiff A.F. ("Plaintiff" or "A.F."), by and through the undersigned counsel, and respectfully submits her Complaint for damages and makes the following allegations.

## INTRODUCTION

1. Plaintiff A.F. is a survivor of human sex trafficking who brings claims against Defendants for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1591 *et seq.*

2. A.F. files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured at hotels owned, operated, maintained, and controlled by Defendants and their agents and employees. A.F. was trafficked at Wyndham branded properties of Defendant Wyndham Hotel & Resorts Inc., and the necessary business connections individually and collectively,

- 1 -

"Wyndham," and Jimmy and Sonia Barona ("Indianapolis Super 8 Franchisee"), and Extended Stay America branded properties of Defendant BRE/ESA Properties LLC. Throughout this Complaint, reference to "Defendants," includes these entities, their predecessors and/or affiliates, collectively and individually.

3.      A.F.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

4.      A.F. met her traffickers in 2014, and was held captive until approximately 2016. Ultimately, her traffickers came to control every aspect of her life. The defining factor of the relationship between A.F. and her traffickers was that each night A.F.'s traffickers forced her to have sex with men for money.

5.       A.F.'s traffickers forced her onto Defendants' properties where she was repeatedly forced to perform commercial sex acts with "buyers" or "johns" under threats of physical and psychological abuse.

6.      Every new customer was another instance A.F. was forced to have sex against her will—that is to say, A.F. was raped multiple times per day by multiple men when she stayed at Defendants' hotels.

7.      At some point, A.F. was able to escape the grasps of her traffickers and the prison of Defendants hotel rooms.

8.      A.F. has spent a considerable amount of time attempting to regain the life that was stripped away by her trafficking.

9. A.F. brings this lawsuit to hold Defendants accountable for imprisoning her and benefitting from participating in a venture furthering her trafficking, in violation of the TVPRA.

## OVERVIEW OF TRAFFICKING

10. A significant portion of all sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

11. For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded victims to sell throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from the trafficking occurring on their properties.

12. Defendants knew and should have known for decades that sex trafficking repeatedly occurs under its brand flags.

13. Rather than taking timely and effective measures to stop profiting from this epidemic, Defendants chose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented and provided Wi-Fi for this explicit and apparent purpose.

14. The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[1] However, traffickers are not the only profiteers. The hotel industry, including Defendants, make millions from participating in ventures that they know or should

---

[1] *Profits and Poverty: The Economics of Forced Labor,* INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts. Defendants and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims, including A.F.

15.    The hotel industry ignored human trafficking on their premises, thereby enabling human trafficking in the United States to flourish.

16.    Defendants and other members of the hospitality industry are and have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general including Defendants own properties worldwide. Defendants and others in the industry have access to much public information on the prevalence of human trafficking at hotels, including reports by the Polaris Project, among others, created for the use of the hospitality industry.

17.    The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite:  continuing with business as usual, so that Defendants and all industry participants continue to profit millions from participating in a ventures in violation of the TVPRA

18.     Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of A.F. on their properties.

<b><u>PARTIES</u></b>

19.     Plaintiff A.F. is a natural person and a resident and citizen of Terre Haute, Indiana.

20.     Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

21.     **Defendant Wyndham Hotel & Resorts, Inc.** ("Wyndham") is a large hotel brand with nearly 9,000 branded properties worldwide. Wyndham is a Delaware corporation with its principal place of business in Parsippany, NJ.

22.     Wyndham maintains a registered agent in Ohio, and it can be served through its registered agent, Corporate Creations Network, Inc., at 119 E. Court Street, Cincinnati, OH 45202.

23.     Wyndham Corporate is the successor entity to **Defendant Travel + Leisure Co. (fka Wyndham Worldwide Corporation)** and retains successor liability for the wrongful acts of its predecessor. Wyndham Corporate's 10K from 2022 states in its filing with the Securities and Exchange Commission ("SEC") in 2022:

> We are one of the world's largest hospitality companies, offering travelers a wide range of hospitality services and products through our global portfolio of world renowned brands. The hospitality industry is a major component of the travel industry, which is one of the largest retail industry segments of the global economy. Our portfolio of brands have a significant presence in many major hospitality markets in the United States and throughout the world and

are uniquely positioned to provide travelers access to a large assortment of travel accommodations and destinations.

Our brands include: Wyndham Hotels and Resorts, Ramada, Days Inn, Super 8, Howard Johnson, Wingate by Wyndham, Microtel Inns & Suites by Wyndham, TRYP by Wyndham, Dolce Hotels and Resorts, RCI, Landal GreenParks, Novasol, Hoseasons, cottages.com, James Villa Holidays, Wyndham Vacation Rentals, Wyndham Vacation Resorts, Shell Vacations Club and WorldMark by Wyndham.

24.    Defendant Wyndham Corporate's 10K filing with the SEC in 2022 states that Wyndham Corporate was spun off from Wyndham Worldwide, now known as Travel + Leisure Co., which was the former parent:

Our business was initially incorporated as Hospitality Franchise Systems, Inc. in 1990 to acquire the Howard Johnson brand and the franchise rights to the Ramada brand in the United States. It was an integral part of Wyndham Worldwide Corporation and its Case: 2:25-cv-00472-SDM-CMV Doc #: 1 Filed: 04/30/25 Page: 8 of 51 PAGEID #: 8 9 predecessor from 1997 to 2018. Wyndham Hotels became an independent, public company in May 2018 when it was spun-off from Wyndham Worldwide, now known as Travel + Leisure Co. ("Travel + Leisure").

25.    Travel + Leisure Co. can be served by its registered agent, Wyndham Worldwide Operations, Inc., located at 6277 Sea Harbor Drive, Orlando, FL 32821.

26.    **Defendant Wyndham Hotel Group, LLC** ("Wyndham Hotel Group"), upon information and belief, is a for-profit Delaware company with its principal place of business in Parsippany, New Jersey. Upon information and belief, Wyndham Hotel Group, LLC is a wholly owned subsidiary of Wyndham Hotels & Resorts, Inc. and a former subsidiary of Wyndham Worldwide Corporation. Wyndham Hotel Group may be served through its registered agent for service, Corporate Creations Network, Inc - 4000 Eagle Point Corporate Drive, Birmingham, AL 35242.

27.     Wyndham Corporate, Wyndham Hotel Group, and Travel + Leisure Co., are referred to collectively as "Wyndham Defendants."

28.     Wyndham owns, supervises, manages, controls, operates, the branded Super 8 by Wyndham.

29.     Super 8 by Wyndham is classified as a value brand hotel.

30.     Wyndham owns, supervises, manages, controls, and/operates the Super 8 located at 450 Bixler Road, Indianapolis, IN 46227 ("Indianapolis Super 8").

31.     **<u>Defendant Jimmy and Sonia Barona</u>** are private individuals operating the Indianapolis Super 8 that is organized and operating under the laws of the State of Indiana. Wyndham Franchisees can be served by its owners, Jimmy or Sonia Barona, located at 1547 W. 151st Street, Westfield, IN 46074.

32.     Defendants benefitted from their operations at the Indianapolis Super 8 in more ways than just through royalty payments, licensing fees, and room revenue. Defendants gathered personal data from the internet and Wi-Fi services they provided to guests, including but not limited to A.F. and her traffickers. This data collection provided further value to Defendants, enhancing their ability to market and promote their services while maintaining and promoting a positive public image for their brand.

33.     Whenever reference is made in this amended complaint to any act, deed, or conduct of Defendants, the allegation is that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or

representatives, who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Cincinnati Super 8.

34.     **Defendant BRE/ESA Properties LLC ("ESA")** is a private company. The company purchases, owns, and manages a network of hotels and motels across forty-six (46) states. ESA does offer franchise properties, and has roughly 125 franchised locations.[2] ESA serves customers throughout the United States.

35.     ESA is a national hotel brand with approximately 700 wholly-owned and franchised properties nationwide.[3] Its corporate headquarters and principal place of business is 13024 Ballantyne Corporate Place, Suite 1000, Charlotte, NC 28277.

36.     ESA maintains a registered agent in Indiana, and it can be served through its registered agent, National Registered Agents, Inc., located at 150 West Market Street, Suite 800, Indianapolis, IN 46204.

37.     ESA owned, supervised, and/or operated the Extended Stay America at 7940 Shadeland Avenue, Indianapolis, IN 46250 ("Indianapolis Extended Stay").

   a.  Indianapolis Extended Stay is an ESA brand property.[4]

   b.  ESA is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at the ESA wholly-owned hotels, including Indianapolis Extended Stay where A.F. was trafficked.

---

[2] https://www.extendedstayamerica.com/media-center/franchise-portfolio-growth
[3] https://www.extendedstayamerica.com/hotels/
[4] https://www.extendedstayamerica.com/hotels/in/indianapolis/castleton?channel=gmb-listing&utm_source=google&utm_medium=organic&utm_campaign=gmb_listing

c. ESA controlled and dictated the actions and inactions of Indianapolis Extended Stay through highly specific and detailed brand standards, policies, and procedures.

d. ESA knowingly benefited, or received something of value, from its commercial business ventures at Indianapolis Extended Stay through the gross room revenue generated by the hotel operations, including rates charged through rooms where A.F. was trafficked, as well as in maintaining a positive public image for the ESA brand. ESA also benefited from gathering personal data from the Wi-Fi it provided and monitored to customers including A.F. and her traffickers.

e. ESA is subject to the jurisdiction of this Court because it regularly conducts business in Indiana, including through the operation of numerous hotels in Indiana, and contracting to supply services in Indiana. ESA has derived substantial revenue from services rendered in Indiana.

38. ESA subjected Indianapolis Extended Stay employees and agents to detailed training, standards and requirements regarding the operation of the ESA location named herein throughout its agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, reporting and expectations imposed by InTown Properties, and it retained the right to enforce its training, policies and standards.

39. Upon information and belief, the standards that ESA imposed and

- 9 -

imposes on its wholly-owned properties at all relevant times included but were not limited to the following:

    a.  Covered virtually all aspects of hotel operations, including internal operating functions; and

    b.  Dictated the specific manner in which hotel management and staff must carry out most day-to-day functions at the Indianapolis Extended Stay.

40. Whenever reference is made in this Complaint to any act, deed, or conduct of ESA, the allegation is that ESA engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Indianapolis Extended Stay, where A.F. was trafficked.

## JURISDICTION AND VENUE

41. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

42. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the Southern District of Indiana.

43. Under 28 U.S.C. §§ 1391(c)(2), the Franchisees of the Wyndham properties are residents of Indiana for the purpose of § 1391(b)(1).

44. This Court has jurisdiction over Wyndham Defendant, Wyndham Franchisees, and ESA Defendant because the subject hotels are located within the Southern District of Indiana.

45. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of Indiana.

46. Plaintiff's claims against the Franchisee arise out of the Franchisee's contacts with Indiana through the Franchisee's relationship with the Wyndham Defendants. The Franchisee's participation in a venture with the Wyndham Defendants operating the subject motel occurred, in substantial part, in Indiana because, all upon information and belief:

a. The Franchisee executed and accepted the franchising agreement in the Southern District of Indiana.

b. Upon Information and belief, the franchising agreement had a choice of law provision selecting the law of Indiana as the governing law.

c. Upon information and belief, the franchising agreement required Franchisee to irrevocably submit itself to the jurisdiction of Indiana courts and waived all objections to personal jurisdiction and service of process.

47. Defendants were corporate affiliates who participated in a joint venture with the Wyndham Defendants, operating hotels in the Southern District of Indiana as described above, and parties to franchising agreements and management

agreements with the Wyndham Defendants, thereby operating the Franchised property, in substantial part, in Indiana, as described above.

### INTRODUCTION TO CLAIMS

48.    A.F. brings her claims against Defendants for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a).

49.    The TVPRA prohibits Defendants from engaging in any venture they knew or should have known involves violations of 18 U.S.C. § 1591, and thereby establishes a non-delegable duty of reasonable care.

50.    An overwhelming majority of commercial sex trafficking transactions occur within hotels and motels, as traffickers use their rooms as the hub for their operations.[5] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues for sex trafficking.  Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

51.    As part of a conspiracy, to save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding human trafficking (or suspected) at the branded properties.  To the extend Defendants did not create any company-wide policies they monitored, they utterly failed to take any meaningful actions as the result of the policies; instead, specifically turning a blind eye to any

---

[5] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754 .

suspected or confirmed commercial sex. Furthermore, Defendants did not train staff how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

52.    Upon information and belief, Defendants kept no reports or data on suspected incidents or occurrences of human trafficking on its properties and the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Defendants did not establish mandatory and secure reporting mechanisms at the point of sale.

53.    With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like A.F. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties.

54.    Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent traumatizing sexual exploitation.

55.    A.F.'s injuries include those which are mental, emotional, and psychological in nature and derive from the trafficking period. The trafficking period is ongoing and continuous and resulting injuries cannot be divided, thereby subjecting Defendants to joint and several liability. Federal common law provides for joint and several liability for indivisible injuries, such as those suffered by A.F.

56.     A.F.'s injuries, which include A.F.'s ongoing mental, emotional, and psychological injuries, have no reasonable basis on which to determine the relative contribution of a particular defendant's conduct to the single harm.

57.     Violators of Section 1595 of the TVPRA are jointly and severally liable for a victim's damages. Victims are entitled to all compensatory and non-compensatory damages incurred during their trafficking period. 18 U.S.C. §1595(a). Thus, Defendants are jointly and severally liable for A.F.'s damages in this case.

## THE SEX TRAFFICKING OF A.F. AT DEFENDANTS' HOTELS

58.     A.F. met her traffickers in approximately 2014 when she was twenty-six (26) years old.

59.     By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, A.F. was held captive and sold for sex by her traffickers.

60.     A.F.'s traffickers confined her to  Defendants' properties, from approximately 2014 to 2016 where her traffickers and her were frequently staying for days at a time.

61.     During the time she was trafficked, A.F.'s traffickers frequently rented rooms at the Defendants' hotel because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with A.F.

62.    Throughout her trafficking, A.F.'s traffickers connected with "johns" by posting or causing to be posted advertisements on websites commonly used to advertise for sex, advertising for A.F.'s availability for commercial sex. A.F.'s traffickers posted many of these advertisements and had conversations with "johns" while connected to Defendants' Wi-Fi.

**THE SEX TRAFFICKING OF A.F. AT THE INDIANAPOLIS SUPER 8**

63.    A.F. was subjected to sex trafficking at the Indianapolis Super 8. The Indianapolis Super 8 was a franchised property. Upon information and belief, Franchisee provided "boots on the ground" at the Indianapolis Super 8 and Wyndham was directly involved in and exercised day-to-day control over operations of the Indianapolis Super 8, including aspects of operations that facilitated A.F.'s trafficking.

64.    A.F.'s traffickers confined her to the Indianapolis Super 8, from approximately 2014 through August 2015, where her and her traffickers were frequently staying for days or weeks at a time.

65.    During the time she was trafficked, A.F.'s traffickers frequently rented rooms at the Indianapolis Super 8 because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with A.F.

66.    A.F. was forced to have sex with multiple "johns" every day she was trafficked at the Indianapolis Super 8.

67. During her captivity at the Indianapolis Super 8, A.F. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, drugged and imprisoned.

68. A.F. encountered the same staff on multiple occasions while at the Indianapolis Super 8. Defendants' staff would have seen the signs of A.F.'s deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of Indianapolis Super 8's property.

69. Further, each stay at the Indianapolis Super 8 resulted in several consistent red flags for the years that A.F. was trafficked, including, but not limited to, paying for stays in cash; obvious signs of illegal drug use; frequent requests for linen changes; large number of condoms in trash; visible signs of prior physical abuse; foot traffic at all hours of the day and night; and loud noises of fighting or emergency audible to other rooms or guests.

70. These red flags were open and obvious to anyone working at the Indianapolis Super 8 and anyone monitoring the activity that lasted consistently for nearly two (2) years.

## THE SEX TRAFFICKING OF A.F. AT THE INDIANAPOLIS EXTENDED STAY

71. A.F. was subjected to sex trafficking at the Indianapolis Extended Stay. A.F.'s traffickers confined her to the Indianapolis Extended Stay, from approximately

2015 through Summer 2016, where her and her traffickers were frequently staying for days or weeks at a time.

72. During the time she was trafficked, A.F.'s traffickers frequently rented rooms at the Indianapolis Extended Stay because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with A.F.

73. A.F. was forced to have sex with multiple "johns" every day she was trafficked at the Indianapolis Extended Stay.

74. During her captivity at the Indianapolis Extended Stay, A.F. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, drugged and imprisoned.

75. A.F. encountered the same staff on multiple occasions while at the Indianapolis Extended Stay. Defendants' staff would have seen the signs of A.F.'s deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of Indianapolis Extended Stay property.

76. Further, each stay at the Indianapolis Extended Stay resulted in several consistent red flags for the years that A.F. was trafficked, including, but not limited to, paying for stays in cash; obvious signs of illegal drug use; frequent requests for linen changes; large number of condoms in trash; visible signs of prior physical abuse; foot traffic at all hours of the day and night; asking the front desk not to be disturbed;

loud noises of fighting or emergency audible to other rooms or guests; and loitering or soliciting on hotel grounds.

77.    These red flags were open and obvious to anyone working at the Indianapolis Extended Stay and anyone monitoring the activity that lasted consistently for months.

## DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT BRANDED PROPERTIES

78.    Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[6] The United Nations,[7] international non-profits,[8] and the U.S. Department of Homeland Security,[9] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds its industry.

79.    For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the

---

[6] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[7] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[8] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[9] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for its hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

80.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign[10] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[11] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

81.     Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking.  Defendants nevertheless do not share

---

[10] *The Blue Heart Campaign,* UNITED NATIONS (2022),
https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heino us%20crime.
[11] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015),
https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

such information with other hotel locations, thereby preventing other hotel locations from acting to protect the victims of such suspected human traffickers.

82. Defendants also have access to public police reports, news reports, and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations.

83. Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

84. A brief examination of just a handful of examples suffices to show the extraordinary frequency with which Defendants have long received and continues receiving evidence and reports that human trafficking runs rampant at their hotel locations:

**WYNDHAM**

    a. Regarding a stay in April 2025 at the Indianapolis Super 8, a hotel customer wrote a review saying, "And here we thought we were the only ones. We were exhausted and trying to avoid being on the interstate during storms and here this place was. I am from Chicago yet this place scared me. Shady drugged out prostitutes in the lobby, the glass around the lobby desk like a currency exchange in the hood. You're forced to give a 125.00 deposit and allegedly I am getting back 120.00 of it but it wasn't a

bank hold they did an actual transaction that now I have to wait 3-5 business days to see if I get or I have to dispute the charge through my bank. …"

b. Regarding another stay in July 2024 at the Indianapolis Super 8, a hotel customer wrote a review saying, "stained sheets, prostitute in parking lot, Mattress has about a million miles on it. need I say more?"

c. Regarding a stay in March 2013 at the Indianapolis Super 8, a hotel customer wrote a review saying, "This motel is the worse motel I've ever stayed at. The rooms are horrible and more like a reach motel . The motel rooms need to renovated and new mattresses are needed for the beds. I have switch my rooms believing that the next room is going to be better than the first and second. They were all the same trashy looking. The towels and was cloths are old, coarse and dingy. I was told by some local folks at the restaurant we ate at and the car rental agency that we should never stay at that motel again. It is well known for attracting drugs and prostitutes characters there. I Will not go there again and Will not recommend anyone else there either ."

d. Another review from a stay in November 2019 at the Indianapolis Super 8 states, "I'm not sure how to summarize nasty in 200 characters. It smelled like dead hookers in the hallways, in fact I

was surprised I didn't have to step over crack addicts in the stairwell. The whole place was gross. Well, it did come with a free pair of "her" panties stuck between the mattresses."

    e.  A review of the Indianapolis Super 8 from November 2014 states "There was a hole to the outside by a/c, bathroom was filthy, bed bugs, very bad smell, and that's the Good parts! Hookers in hotel, drug deals going down, beer cans everywhere. I hope No one ever stays here again! The place needs to be burned down to get rid of the bugs! I have to give it a 1 because there is nothing less. It should be a minus 10."

### ESA

    a.  Regarding a stay in June 2012 at the Indianapolis Extended Stay, a hotel customer wrote a review saying, "… Also - and this is our actual experience - if you arrive late enough (we arrived a little before midnight) you'll be greeted and checked in by the laundry lady since the desk closes. You'll also get a chance to say hello to the departing prostitutes, Who were leaving for the night as we arrived."

85.    Wyndham is a signatory of the Code[12] and thereby has promised to adopt these policies to combat trafficking. Yet, Wyndham has failed to implement

---

[12] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

most, if not all of these policies, and continue to unlawfully benefit from the trafficking occurring on their properties.

86.    Wyndham is a face and signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

87.    ESA is a signatory of the Code[13] and thereby has promised to adopt these policies to combat trafficking. Yet, ESA has failed to implement most, if not all of these policies, and continue to unlawfully benefit from the trafficking occurring on their properties.

88.    Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

89.    Defendants profited from the sex trafficking of Plaintiff A.F. Defendants rented rooms to and provided Wi-Fi to A.F.'s traffickers when they knew, or should have known, that human trafficking was prevalent within its branded properties The

---

[13] *Id.*

hotel staff, especially front desk staff at Defendants hotels knew or should have known of the obvious signs of A.F.'s trafficking.

## DEFENDANTS ACTIVELY FACILITATED SEX TRAFFICKING, INCLUDING THE SEX TRAFFICKING OF A.F.

90.    Defendants had both actual and constructive knowledge of the trafficking of A.F. at the subject properties because the trafficking was the direct result of Defendants facilitating her trafficking at the subject properties.

### The Franchisees Facilitated A.F.'s Trafficking at Indianapolis Super 8

91.    The Franchisees are responsible for the acts, omissions, and knowledge of all employees of the Indianapolis Super 8 when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Franchisees ratified these acts and omissions, and because Franchisees failed to exercise reasonable care with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisees, of sex trafficking occurring at Wyndham branded locations including the Indianapolis Super 8.

92.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Indianapolis Super 8, Franchisees continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including A.F.

86.    Franchisees knew or were willfully blind to the fact that A.F. was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate A.F.'s sexual exploitation.

87. Franchisees knowingly or recklessly engaged in a longstanding pattern of conduct that generated revenue and other benefits by facilitating that trafficking.

88. Franchisees facilitated widespread trafficking at the Indianapolis Super 8, including the trafficking of A.F., in ways including:

    a. allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

    b. inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

    c. choosing not to report known or suspected criminal activity including sex trafficking to appropriate law enforcement agencies;

    d. implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

### The Wyndham and ESA Defendants Facilitated the Trafficking of A.F. at the Indianapolis Super 8 and Indianapolis Extended Stay

93. Defendants benefited from the steady stream of income that A.F.'s traffickers and "johns" bring to its hotel brands. Defendants profited from each and every room that A.F.'s traffickers and customers rented where A.F. was harbored and maintained for the purpose of sex trafficking. In addition, Defendants profited from data collected each and every time A.F.'s traffickers and customers used Defendants' Wi-Fi to advertise and solicit A.F. for commercial sex.

94. Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of the benefits they were

receiving from the human trafficking occurring at the locations where A.F. was trafficked given Defendants had access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

95.    Moreover, Defendants repeatedly collected data on A.F., her traffickers, and "johns" from her many stays at Defendants' hotels, including but not limited to room reservations, identification and payment information, data from websites visited on Wi-Fi, and other guest data. Defendants' employees witnessed the obvious signs of A.F.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. Despite having access to all this information for years, Defendants failed to take reasonable measures to stop benefitting from sex trafficking from occurring in its hotels. If Defendants would have taken proper measures, Defendants would not have profited from A.F. and other victims like her being trafficked at their locations.

96.    Defendants discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where A.F. was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-risk events and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

97.     Pursuant to these policies, branded location employees and property management regularly reported customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations. The staff at the hotels where A.F. was trafficked reported this to Defendants or would have if Defendants did not fail to institute reasonable policies and procedures.

98.     In addition, Defendants had access to much of this data through the management of centralized data systems they required the branded properties to use, including but not limited to the property management, booking, credit processing, and information technology and internet systems.

99.     Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Defendants maintained their deficiencies to maximize profits by:

      a.  Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

      b.  Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

      c.  Collecting and utilizing massive amounts of data from all of its

branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in its hotels;

d. Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e. Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f. Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g. Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on its properties.

100. As a direct and proximate result of these egregious practices on the part of Defendants, A.F. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**DEFENDANTS' CONTROL OVER THEIR BRANDED PROPERTIES**

101.    Upon information and belief, it is a standard practice in the hospitality industry, followed by Defendants, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

102.    Defendants provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand. The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

103.    Defendants provide their branded properties brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to its brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites. Thus, booking and room reservations are to a substantial extent controlled by Defendants.[14] Defendants see booking and reservation trends, including for the hotel locations by Defendants where Plaintiff was trafficked.[15]

104.    Upon information and belief, Defendants require their branded hotel properties to use a property management system, which is linked to Defendants

---

[14] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel- industry/.
[15] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

105.   Upon information and belief, per the relevant franchise agreements,[16] Defendants may enforce their brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

106.   Defendants exercise day-to-day control over the hotel locations by Defendants and their other brand hotels through centralized corporate systems, training, policies, and brand standards. Defendants implement and retain brand hotel control, including control over the Indianapolis Super 8 and Indianapolis Extended Stay, as either direct subsidiaries or under the terms of its franchise agreements.

107.   Upon information and belief, Defendants' brand standards are so strict as to bar entirely certain efforts to combat trafficking, for instance by prohibiting the prominent placement of informational signs within hotel rooms offering to help victims escape.

108.   It is further a standard practice in the hospitality industry, upon information and belief, followed by Defendants, for parent companies to exercise significant control over the employment decisions of their hotel locations.

109.   The Defendants and their hotel locations exhibit a significant degree of interrelated, intermingled, and unified operations at the locations at which A.F. was

---

[16] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

trafficked. Upon information and belief, Defendants promulgate policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel locations at which A.F. was trafficked.

110.    On information and belief, Defendants utilize some of these funds to monitor the brand standards and to offer training to hotel operators and franchisees.

111.    Under federal labor regulations, Defendants are each considered joint employers of the employees at their locations at which A.F. was trafficked.

112.    Specifically, the Defendants control the creation and promulgation of policies relating to training employees to recognize and respond to human trafficking, and Defendants determine whether such training shall be mandatory.

113.    Despite their knowledge that few, if any, employees at their hotel locations actually receive trainings if the same are not mandated, Defendants have failed to mandate such training on any significant scale or at the specific locations where A.F. was trafficked.

114.    On information and belief, the Defendants require their hotel locations to pay approximately 10% of gross revenue back to Defendants for the privilege of using the Defendants' names and following their brand standards.

## CAUSE OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")

115.    Plaintiff incorporates each foregoing allegation.

116.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

117.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty through its participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

118.    Defendants have benefited as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff when they knew or should have known violations of §1591(a) were occurring. The actions, omissions, and/or commissions alleged in this pleading were the "but for"' and proximate cause of Plaintiff's injuries and damages.

119.    Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels.

120.    Despite knowledge of Plaintiff's sex trafficking by Defendants, Plaintiff's traffickers were able to continue renting rooms for the sexual exploitation of Plaintiff.

121.    Defendants participated in a venture together and with, among others, Plaintiff's traffickers. Defendants had an ongoing business relationship and association in fact with Plaintiff's traffickers. Despite knowing or having reason to know that Plaintiff was sex trafficked in violation of the TVPRA, Defendants continued to rent rooms to her traffickers, providing a secure venue for Plaintiff's sexual exploitation. Plaintiff's traffickers used Defendants' hotels because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers shared a common purpose - the rental of hotel rooms and the making of profits. Defendants profited while Plaintiff's traffickers were able to rent a secure venue to earn profits by trafficking Plaintiff. Defendants participated in the venture by continually renting rooms to Plaintiff's traffickers, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of Plaintiff's trafficking.

122.    Defendants' failure to train and supervise their agents and employees, as well as their disregard for the welfare of their guests, including Plaintiff, enabled and contributed to her sex trafficking.

123.    The facts alleged establish that Defendants knowingly benefitted, financially or by receiving anything of value, from participating in a venture that

Defendants knew or should have known was engaged in an act in violation of the TVPRA.

124.    Plaintiff further alleges that, as a result of the relationship between Defendants and their branded properties, Defendants are vicariously liable for the acts of their branded properties, including the hotel locations where A.F. was trafficked. Defendants and their branded properties jointly controlled the terms and conditions of employment for staff, making them joint employers. Factors that support this allegation include shared profits, standardized employee training, strict rules of operation, control over pricing and reservations, regular inspections, operational support, and Defendants' right to terminate franchise agreements with their branded properties, for failing to comply with these requirements. Therefore, Defendants retained control, or the right to control, the mode and manner of work contracted for, making them responsible for the acts and omissions of staff and branded properties.

125.    Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels, with the actions, omissions, and /or commissions alleged in this pleading being the "but for" cause and proximate cause of Plaintiff's injuries and damages. Defendants are jointly and severally liable for Plaintiff's injuries and damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

    a.  Awarding Plaintiff all available compensatory damages for each cause

of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b. Disgorgement of profits obtained through unjust enrichment;

c. Restitution;

d. Statutory and/or treble damages, where available;

e. Punitive damages;

f. Attorneys' fees and expenses;

g. The costs of this action;

h. Pre- and post-judgment interest; and

i. Any other relief the Court or jury deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by struck jury.

Dated: July 21, 2025

Respectfully submitted,

/s/ *Joseph N. Williams*
Joseph N. Williams (#25874-49)
**Williams Law Group, LLC**
1101 N. Delaware Street, Suite 200
Indianapolis, IN  46202
T:  317-633-5270
E:  joe@williamsgroup.law

*/s/ Steven C. Babin, Jr.*
Steven C. Babin, Jr. (*phv forthcoming*)
Penny Barrick (*phv forthcoming*)
**Babin Law, LLC**
10 W. Broad St., Suite 900
Columbus, Ohio 43215
T: 614-761-8800
E: steven.babin@babinlaws.com
   penny.barrick@babinlaws.com

*Attorneys for Plaintiff*