**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| A F,<br><br>Plaintiff,<br><br>v.<br><br>WYNDHAM HOTEL & RESORTS, INC.,<br>TRAVEL + LEISURE CO.,<br>WYNDHAM HOTEL GROUP, LLC,<br>JIMMY BARONA,<br>SONIA BARONA,<br>ESA P PORTFOLIO OPERATING LESSEE, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:25-cv-01451-TWP-MG |

**ORDER DENYING MOTIONS TO DISMISS AMENDED COMPLAINT**

This case arises from the alleged sex trafficking of Plaintiff A.F. ("A.F.") at an Extended Stay America hotel and a Super 8 hotel in Indianapolis. A.F. asserts claims under the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595(a) ("TVPRA"), against the Extended Stay's operator, ESA P Portfolio Operating Lessee, Inc. ("ESA"), the Super 8's franchisor and operator, Defendants Wyndham Hotel & Resorts, Inc., Travel + Leisure Co., and Wyndham Hotel Group, LLC (together, "Wyndham"), and the Super 8's franchisees, Jimmy and Sonia Barona (together, the "Baronas") (collectively, "Defendants"). This matter is now before the Court on Motions to Dismiss the First Amended Complaint filed pursuant to Federal Rule of Civil Procedure 12(b)(6) by Defendants ESA (Filing No. 27) and Wyndham (Filing No. 38). For the reasons explained below, the Motions to Dismiss are **denied**.

## I. BACKGROUND

The following facts are not necessarily objectively true, but as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws all

inferences in favor of A.F. as the non-moving party. *See Bielanski v. Cnty. of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

Wyndham owns, supervises, manages, controls, and operates the Super 8 brand of value hotels, including the Super 8 located a 450 Bixler Road in Indianapolis, Indiana (the "Super 8") *Id.* ¶¶ 28–30. The Baronas are franchisees that operate the Super 8. *Id.* ¶ 31. ESA purchases, owns, and manages a network of approximately seven hundred wholly owned or franchised properties, including the Extended Stay America at 7940 Shadeland Avenue in Indianapolis, Indiana (the "Extended Stay"). *Id.* ¶¶ 34–37.

Plaintiff A.F. met her traffickers around 2014, when she was twenty-six years old. *Id.* ¶ 58. Over the next approximately two years, she was held hostage and sold for sex through a combination of "force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing." *Id.* ¶ 59. A.F. and her traffickers would frequently stay at the Super 8 and Extended Stay. *Id.* ¶ 60. A.F.'s traffickers frequently rented rooms at the Super 8 and Extended Stay because they were convenient, anonymous, and central locations for "johns" who would pay for sex with A.F. *Id.* ¶¶ 61, 65, 72. The traffickers advertised A.F.'s availability for sex and connected with "johns" using the Wi-Fi at the Super 8 and Extended Stay. *Id.* ¶ 62.

AF's traffickers confined her to the Super 8 from approximately 2014 to August 2015, where she and the traffickers would frequently stay for days or weeks at a time. *Id.* ¶ 64. A.F. was forced to have sex with multiple "johns" every day she was trafficked at the Super 8. *Id.* ¶ 66. She was raped, continuously abused physically and verbally, malnourished, and drugged. *Id.* ¶ 67. While being trafficked at the Super 8, A.F. encountered the same staff multiple times. Staff would have seen signs of A.F.'s abuse, including bruising and verbal abuse in public areas. *Id.* ¶ 68. A.F.'s

stays at the Super 8 were also accompanied by several "red flags" that signal sex trafficking, including paying for stays in cash; obvious signs of illegal drug use; frequent requests for linen changes; large numbers of condoms in the trash; visible signs of prior physical abuse; foot traffic at all hours of the day and night; and loud noises, like fighting, audible to other rooms and guests. These obvious signs of trafficking were open, obvious, and witnessed by staff. *Id.* ¶¶ 69–70, 95.

A.F.'s confinement at the Extended Stay was no different. Between approximately 2015 to Summer 2016, A.F.'s traffickers frequently confined her to the Extended Stay for days or weeks at a time. *Id.* ¶ 71. A.F. was again forced to have sex with multiple "johns" every day she was trafficked at the Extended Stay. *Id.* ¶ 73. She was raped, abused, malnourished, and drugged. *Id.* ¶ 74. A.F. encountered the same staff on multiple occasions while at the Extended Stay. Staff would have seen the same signs of A.F.'s abuse, including bruising and public verbal abuse. *Id.* ¶ 75. All of the same "red flags" present at the Super 8 were present throughout A.F.'s trafficking at the Extended Stay. *Id.* ¶ 76. These "red flags" were again open, obvious, and witnessed by Extended Stay staff. *Id.* ¶ 77.

An overwhelming majority of commercial sex trafficking transactions occur at hotels and motels, including the Super 8 and Extended Stay, with traffickers using those rooms as a hub for their operations. Hotels offer anonymity, non-traceability, and privacy, making them ideal trafficking venues. *Id.* ¶ 50. Traffickers also regularly use the hotel Wi-Fi to advertise and solicit victims for commercial sex against the victims' will. *Id.*

Defendants are aware that the hospitality industry is a "life source" of human trafficking. *Id.* ¶ 78. That much has been made clear by the United Nations, the United States Department of Homeland Security, and international non-profit organizations. *Id.* ¶ 78–80. One such organization, the End Child Prostitution and Trafficking ("EPCAT"), launched a Tourism Child-

Protection Code of Conduct (the "Child-Protection Code"), which identifies steps companies should take to prevent child sex trafficking and best practices to prevent sex trafficking. *Id.* ¶ 79. Wyndham and ESA are both signatories to the Child-Protection Code, *id.* ¶¶ 85, 87. Wyndham is also a signatory to the ECPAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking. *Id.* ¶ 86.

Defendants have access to individual hotel location do-not-rent lists that often provide reasons for refusals to rent, including suspicion of human trafficking. Defendants nevertheless do not share that information with other hotel locations, preventing other hotel locations from acting to identify or prevent trafficking. *Id.* ¶ 81.

Defendants also have access to police reports, news reports, and internal reports generated by customers and employees about sex trafficking at their hotels. *Id.* ¶¶ 82–83. As some examples, the Super 8 received the following online guest reviews: in April 2025, a guest mentioned "[s]hady drugged out prostitutes in the lobby"; in July 2025, another guest complained of "stained sheets, prostitute in parking lot," and a mattress with "about a million miles on it. need I say more?"; a review from November 2019 stated the Super 8 "smelled like dead hookers in the hallways" and came with "a free pair of 'her' panties stuck between the mattresses"; in November 2014, one reviewer stated there were "Hookers in [the] hotel, drug deals going down, beer cans everywhere"; and in March 2013, a guest wrote, "I was told by some local folks at the restaurant we ate at and the car rental agency that we should never stay at that motel again. It is well known for attracting drugs and prostitutes characters [*sic*] there." *Id.* at pp. 21–23, ¶ 84(a)–(e).[1] As for the Extended Stay, one June 2012 review stated, "if you arrive late enough . . . [y]ou'll . . .get a chance to say hello to the departing prostitutes, [w]ho were leaving for the night as we arrived." *Id.* at 23 ¶ 84(a).

[1] Some paragraph numbers in the Amended Complaint are repeated, so the Court cites to page numbers where needed.

Despite this knowledge, Defendants failed to create, adopt, implement, or enforce company-wide policies and procedures regarding human trafficking; they failed to take meaningful actions as the result of any such policies; they did not establish mandatory and secure reporting mechanisms at the point of sale; and they kept no reports or data on suspected incidents of human trafficking. *Id.* ¶¶ 51–52. They likewise do not train staff how to identify and respond to suspected trafficking, fail to require training on human trafficking policies and procedures, and fail to conduct audits confirming compliance with policies and procedures. Instead, Defendants have turned a blind eye to suspected or confirmed commercial sex. *Id.* ¶ 51.

A.F. alleges that the Baronas, despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Super 8, continued renting rooms used to sexually exploit victims, including A.F. *Id.* ¶ 92. They allegedly facilitated widespread trafficking at the Super 8 by allowing inappropriate or inadequate practices for hiring, training, and supervising staff on human trafficking issues, inadequately enforcing trafficking notices and training, choosing not to report known or suspected criminal activity, and creating an environment where traffickers could operate without detection or interference by hotel staff. *Id.* p. 25–26 ¶ 88.

Wyndham and ESA allegedly benefited from the "steady stream of income" provided by A.F.'s traffickers and "johns" through room fees and Wi-Fi data collection. *Id.* ¶¶ 89, 93. Staff at the Super 8 and Extended Stay reported customer data and other indicators of sex trafficking to Wyndham and ESA, or they would have if Wyndham and ESA had not failed to institute reasonable policies and procedures to identify, report, and prevent human trafficking *Id.* ¶ 97. A.F. alleges ESA and Wyndham failed to "take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties" by: failing to mandate and minimize the cost of employee training on how to spot signs of human trafficking; failing to lower the costs of analyzing data received on

criminal activity, like customer reviews, that indicate sex trafficking; failing to utilize the data they collect from their branded locations to combat sex trafficking in their hotels; failing to refuse room rentals or report guests to law enforcement, even if renters were traffickers or "johns"; failing to monitor guest Wi-Fi use for illicit commercial sex purposes or trafficking; failing to institute proper security measures to combat trafficking; and failing to hold franchisees accountable for contributing to the prevalence of sex trafficking on their properties. *Id.* ¶ 99.

ESA and Wyndham exerted control over their branded properties and "set exacting brand quality standards" for each property. *Id.* ¶¶ 101–04, 106–10. They can use their relevant franchise agreements to enforce those standards through periodic inspections and threats of terminating the franchise agreements. *Id.* ¶ 105. Among other things, ESA and Wyndham "control the creation and promulgation of policies relating to training employees to recognize and respond to human trafficking, and [they] determine whether such training shall be mandatory." *Id.* ¶ 112. They do not mandate such training on a significant scale, or at the Super 8 or Extended Stay, despite knowing that staff at those locations do not receive such training. *Id.* ¶ 113.

On July 21, 2025, A.F. initiated this TVPRA action. A.F. has since filed her operative Amended Complaint against the Baronas, Wyndham, and ESA[2] (Filing No. 11). The Baronas have filed their Answer (Filing No. 21). Wyndham and ESA filed the instant Motions to Dismiss (Filing No. 27; Filing No. 38), which are fully briefed. Wyndham has also filed a notice of supplemental authority (Filing No. 47; Filing No. 50). The Motions to Dismiss are now ripe for review.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When

[2] AF's original Complaint named BRE/ESA Properties, LLC, as a defendant. The Amended Complaint replaced BRE/ESA Properties, LLC, with ESA P Portfolio Operating Lessee, Inc. (Filing No. 11 at 1 n.1).

deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff. *Bielanski*, 550 F.3d at 633. However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact." *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, the Supreme Court explained that the complaint must allege facts that are "enough to raise a right to relief above the speculative level." 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.*; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("it is not enough to give a threadbare recitation of the elements of a claim without factual support"). The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation modified). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

## III. DISCUSSION

ESA and Wyndham argue that A.F.'s Amended Complaint is deficient in several respects. The Court begins its discussion with Wyndham and ESA's shared argument that the Amended Complaint is a "shotgun" pleading that fails to satisfy Rule 8, and that all or some of A.F.'s claims are time-barred. The Court will then turn to ESA's and Wyndham's respective arguments that the Amended Complaint fails to allege a plausible TVPRA claim against each of them.

**A. "Shotgun" Pleading**

Wyndham and ESA argue that the Amended Complaint is a "shotgun" pleading that lumps all Defendants together and fails to allege A.F.'s claims with the particularity required by Rule 8 (Filing No. 28 at 5–6; Filing No. 39 at 13–16). A.F. concedes that some of her allegations relate to sex trafficking and the hospitality industry generally, but she contends that her allegations as a whole nevertheless give each Defendant adequate notice of the claims against them (Filing No. 37 at 15–18; Filing No. 41 at 6–11).

Rule 8 requires a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545. "Shotgun pleadings" are pleadings that are "so lengthy, repetitive, and jumbled as to make it impossible for [d]efendants or the court to ascertain which facts are relevant to which claims and to which defendant(s)." *Eberhardt v. Village of Tinley Park*, No. 20 C 3269, 2020 WL 10618313, at *1 (N.D. Ill. Oct. 14, 2020). The impermissibility of "shotgun" or "group" pleadings is often discussed in fraud cases, where the pleading standard requires "particularity." Fed. R. Civ. P. 9(b).

Here, Wyndham and ESA argue A.F.'s lack of specificity regarding their alleged actions deprive them of "fair notice" of what each is alleged to have done (Filing No. 52 at 3). Wyndham and ESA point to A.F.'s allegations providing an overview of sex trafficking (Filing No. 11 ¶¶ 12–14), allegations introducing A.F.'s claims, *id.* ¶¶ 50–53, general allegations about A.F.'s trafficking, *id.* ¶¶ 58–62, allegations of what information would have been known to all Defendants, *id.* ¶¶ 81–83, and the elements of A.F.'s claims, *id.* p. 24 ¶¶ 88–89. These allegations, while generalized, are not improper because they provide information relevant to A.F.'s claims. *See A.W. v. Red Roof Inns, Inc.*, No. 21-cv-4934, 2025 WL 227160, at *2–3 (S.D. Ohio Jan. 17, 2025).

More importantly, the Amended Complaint contains additional allegations about ESA and Wyndham, which satisfy Rule 8. As to ESA, the Amended Complaint alleges:

> ESA knowingly benefited . . . from its commercial business ventures at Indianapolis Extended Stay . . . .
>
> A.F. was subjected to sex trafficking at the Indianapolis Extended Stay. A.F.'s traffickers confined her to the Indianapolis Extended Stay, from approximately 2015 through Summer 2016, where her and her traffickers were frequently staying for days or weeks at a time.
>
> During the time she was trafficked, A.F.'s traffickers frequently rented rooms at the Indianapolis Extended Stay because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with A.F. . . .
>
> A.F. encountered the same staff on multiple occasions while at the Indianapolis Extended Stay. Defendants' staff would have seen the signs of A.F.'s deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of Indianapolis Extended Stay property.
>
> Further, each stay at the Indianapolis Extended Stay resulted in several consistent red flags for the years that A.F. was trafficked . . . .
>
> These red flags were open and obvious to anyone working at the Indianapolis Extended Stay and anyone monitoring the activity that lasted consistently for months. . . .
>
> ESA is a signatory of the [Child-Protection Code] and thereby has promised to adopt these policies to combat trafficking. Yet, ESA has failed to implement most, if not all of these policies, and continue to unlawfully benefit from the trafficking occurring on their properties.

(Filing No. 11 ¶ 37(b), ¶¶ 71–77, 87). As to Wyndham, the Amended Complaint alleges:

> The Franchisee's participation in a venture with the Wyndham Defendants operating the subject motel occurred, in substantial part, in Indiana . . . .
>
> A.F. was subjected to sex trafficking at the Indianapolis Super 8. . . .
>
> A.F.'s traffickers confined her to the Indianapolis Super 8, from approximately 2014 through August 2015, where her and her traffickers were frequently staying for days or weeks at a time.
>
> A.F. encountered the same staff on multiple occasions while at the Indianapolis Super 8. Defendants' staff would have seen the signs of A.F.'s deterioration brought

> on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public areas of Indianapolis Super 8's property.
>
> Further, each stay at the Indianapolis Super 8 resulted in several consistent red flags for the years that A.F. was trafficked . . . .
>
> These red flags were open and obvious to anyone working at the Indianapolis Super 8 and anyone monitoring the activity that lasted consistently for nearly two (2) years. . . .
>
> Wyndham is a signatory of the [Child-Protection Code] and thereby has promised to adopt these policies to combat trafficking. Yet, Wyndham has failed to implement most, if not all of these policies, and continue to unlawfully benefit from the trafficking occurring on their properties.
>
> Wyndham is a face and signatory to the EPCAT anti-trafficking knowledge, guidance, and information necessary to prevent human trafficking, and Wyndham publicly committed to participate in the programs shown to assist in identifying and preventing sex trafficking inside its brand hotels. Therefore, Wyndham should not only have created effective Brand standards for implementation, mandates, and operations, but also enforced them.

*Id.* ¶¶ 46, 58–70, 85–86. The Amended Complaint further identifies guest reviews for the Super 8 and Extended Stay, alleging that those reviews show Wyndam and ESA's respective knowledge. *Id.* pp. 21–23 ¶¶ 84(a)–(e) (Super 8 reviews), p. 23 ¶ (a) (Extended Stay review).

These allegations provide fair notice to ESA and Wyndham of A.F.'s claims against each of them. *See M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 972–73 (S.D. Ohio 2019) (finding that similar TVPRA allegations were sufficiently particular under Rule 8); *K.O. v. G6 Hosp., LLC*, 728 F. Supp. 3d 624, 640–41 (E.D. Mich. 2024) (same) (collecting cases). This is not a situation where defendants "[were] not even mentioned in the body of the complaint" or where "[t]he only allegations that could plausibly apply to them are allegations directed at all . . . Defendants." *Ingris v. Borough of Caldwell*, No. 14-855, 2015 WL 3613499 (D.N.J. Jun. 9, 2015).

ESA and Wyndham also cite several allegations that "Defendants," generally, facilitated A.F.'s trafficking and about "Defendants'" control over "their branded properties." (Filing No. 11 ¶¶ 92–114). In context of the Amended Complaint, these allegations are not confusing "shotgun"

allegations. The first group of these allegations, *id.* ¶¶ 93–100, fall under the heading "The Wyndham and ESA Defendants facilitated the Trafficking of A.F. at the Indianapolis Super 8 and Indianapolis Extended Stay," *id.* at p. 26, so these allegations plainly refer to Wyndham and ESA, not the Baronas. A.F.'s other allegations detailing Wyndham's operation of the Super 8, *e.g.*, *id.* ¶¶ 21–30, and ESA's operation of the Extended Stay, *e.g.*, *id.* ¶¶ 34–40, are sufficient to notify each Defendant as to how they allegedly facilitated A.F.'s trafficking. The second group of allegations, *id.* ¶¶ 101–14, also plainly refer to Wyndam and ESA and not the Baronas, as these allegations discuss standard practices for "parent companies" and franchisors, not franchisees. While the Amended Complaint could have been more polished or more explicit in identifying ESA and Wyndham, these imperfections do not render the Amended Complaint so confusing or unintelligible that it fails to satisfy Rule 8.

Further, the fact that A.F. alleges that Wyndam and ESA (whether referred to separately or together) engaged in the same conduct is not fatal to her claims (Filing No. 28 at 4–5 (arguing that A.F.'s allegations against ESA are "duplicative" of her allegations against Wyndham)). "[T]he mere fact that the factual underpinnings of the claims against each defendant are the same does not necessarily equate to a failure to provide fair notice." *S.G. Coastal Hosp. Assocs., LLC*, No. 25-cv-274, 2025 WL 3243431, at *6 (E.D. Va. Nov. 20, 2025); *J.L. v. Best W. Int'l, Inc.*, 521 F. Supp. 3d 1048, 1075 (D. Colo. 2021) ("And because all of plaintiff's claims have essentially the same factual underpinning, the Court is not persuaded that this is a case where incorporating prior allegations into each claim makes the claims unintelligible."); *S.Y. v. Wyndham Hotels & Resorts, Inc.*, 519 F. Supp. 3d 1069, 1078 (M.D. Fla. 2021) ("The failure to specify a particular defendant is not fatal, however, when [t]he complaint can be fairly read to aver that all defendants are responsible for the alleged conduct." (alteration in original) (citation modified)).

AF's Amended Complaint is not so lengthy or unintelligible that neither Wyndham, ESA, or the Court can understand A.F.'s claims. The Amended Complaint satisfies Rule 8, so ESA's and Wyndham's requests to dismiss the Amended Complaint for that reason are **denied**.

**B. Statute of Limitations**

ESA and Wyndham next argue that A.F.'s claims are completely or partially[3] barred by the TVPRA's ten-year statute of limitations. 18 U.S.C. § 1595(c)(1); (Filing No. 28 at 6–7; Filing No. 39 at 16–18). A.F.'s Amended Complaint alleges she was trafficked at the Super 8 from "approximately 2014 through August 2015" and at the Extended Stay from "approximately 2015 through Summer 2016." (Filing No. 11 ¶¶ 64, 71). A.F. further alleges that during these periods, her traffickers "frequently rented rooms" at these hotels "for days or weeks at a time." *Id.* ¶¶ 65, 72. A.F. initiated this action on July 21, 2025, so the latest approximate dates of her trafficking at each hotel fall within the ten-year limitations period. ESA and Wyndham nevertheless argue that A.F.'s TVPRA claim should be dismissed, in whole or in part, for two reasons.

First, Wyndham argues that because A.F. fails to allege the specific dates of her trafficking at the Super 8, she "fails to plausibly allege any act (let alone alleged trafficking) that occurred during August 2015, as opposed to days or weeks before that." (Filing No. 42 at 3–4). The Court disagrees. At the pleading stage, the Court accepts A.F.'s allegations as true and draws reasonable inferences in her favor. Her allegations that her trafficker frequently rented rooms at the Super 8 "for days or weeks at a time" through approximately August 2015 is more than sufficient to permit a reasonable inference that she was trafficked at the Super 8 at some point after July 21, 2015.

[3] As a procedural matter, this request for a partial dismissal is improper. "A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015); *Signal Funding, LLC v. Sugar Felsenthal Grais & Helsinger LLP*, 136 F.4th 718, 724 (7th Cir. 2025).

Second, both Wyndham and ESA argue that any claims arising from trafficking before July 21, 2015 should be dismissed (Filing No. 42 at 3–5; Filing No. 28 at 6–7). A.F. responds that the alleged TVPRA violations are "continuing" in nature, so her claims against each Defendant did not accrue until the latest respective trafficking incident (Filing No. 37 at 18–20; Filing No. 41 at 11–12). The "continuing violation" doctrine is an exception to the general rule that a cause of action accrues when the plaintiff first knew or should have known of her injury. The doctrine shifts the claim's accrual date and "allow[s] suit to be delayed until a series of wrongful acts blossoms into an injury on which suit can be brought." *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 801 (7th Cir. 2008); *see Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001) (stating doctrine applies "when it would be unreasonable to require or even permit [a plaintiff] to sue separately over every incident of the defendant's unlawful conduct"). A.F. secondly argues that dismissal of her claims on the statute of limitations would be premature at this stage, since Wyndham and ESA have not shown, based on the face of the Amended Complaint, that her claims are time-barred.

The Court agrees with A.F.'s second argument and finds that dismissal of her claims as time-barred would be premature. "Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Cap. Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). "As long as there is a conceivable set of facts, consistent with the complaint, that would defeat a statute-of-limitations defense, questions of timeliness are left for summary judgment (or ultimately trial), at which point the district court may determine compliance with the statute of limitations based on a more complete factual record." *Sidney Hillman Health Ctr. of Rochester v. Abbott Lab'ys, Inc.*, 782 F.3d 922, 928 (7th Cir. 2015). Nevertheless, "a district court may dismiss under Rule 12(b)(6) something that is indisputably time-barred." *Small v. Chao*, 398 F.3d 894, 898

(7th Cir. 2005); *see Cancer Found., Inc.*, 559 F.3d at 674–75 (stating "dismissal is appropriate when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness"); *Chi. Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 613–14 (7th Cir. 2014) ("[A] motion to dismiss based on failure to comply with the statute of limitations should be granted only where the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense." (quotation marks omitted)).

Based on the face of the Amended Complaint, A.F.'s claims are not "indisputably time-barred," so dismissal under the statute of limitations would be premature. Wyndham cites several out-of-circuit cases that partially dismissed the plaintiffs' TVPRA claims as time-barred, but those cases were largely based on Ninth Circuit precedent, which was binding on those courts.[4] *Compare Bird v. Dep't of Human Servs.*, 935 F.3d 738, 748 (9th Cir. 2019) (stating doctrine "is virtually non-existent" outside "a limited exception for hostile work environment claims"), *with Limestone Dev. Corp.*, 520 F.3d at 801 (identifying workplace harassment as "[a] typical case" in which the doctrine would apply and that "[o]ne can imagine conducting a similar analysis in a RICO case").

As the parties' competing authority illustrates, courts are split as to whether the continuing violation doctrine applies to TVPRA claims, and it is a matter of first impression in this district (*Compare* Filing No. 39 at 17–18; *and* Filing No. 42 at 4 n.3; *with* Filing No. 37 at 18; *and* Filing No. 41 at 12). So A.F.'s claims are, at most, disputably time-barred. The Court will therefore not take the "unusual step" of partially dismissing A.F.'s claims at this stage. *Cancer Found., Inc.*, 559

[4] The cases relied on by Wyndham and ESA outside of the Ninth Circuit either did not analyze whether the continuing violation doctrine applied to TVPRA claims or were decided on summary judgment. *See H.G. v. Inter-Cont'l Hotels Corp.*, 489 F. Supp. 3d 697 (E.D. Mich. 2020) (dismissing claims for failure to allege all elements but noting in dicta, without discussing continuing violation doctrine, that some claims would be time-barred even if sufficiently pled); *K.O.*, 728 F. Supp. 32d at 640 (not mentioning continuing violation doctrine); *Lundstrom v. Holiday Hosp. Franchising, LLC*, No. 22-cv-56, 2023 WL 4424725, at *10 (D.N.D. May 23, 2023) (declining to consider whether doctrine applied); *Ardolf v. Weber*, No. 18 Civ. 12112, 2020 WL 5209525, at *4 n.2 (S.D.N.Y. Sep. 1, 2020) (finding on summary judgment that claim accrued more than ten years before suit); *K.A. v. 26th Street Hosp., LLP*, No. 23-cv-92, 2024 WL 2112480, at *8 (D.N.D. Apr. 15, 2024) ("[T]he Plaintiff does not address statute of limitations.").

F.3d at 674; *see Emily T. v. SBY Downers Grove*, No. 25 C 3303, 2026 WL 1265381, at *7 (N.D. Ill. May 8, 2026) (finding some of plaintiff's TVPRA claims were based on events more than 10 years prior to filing the complaint, but finding that dismissal on statute of limitations grounds was not warranted at the pleading stage "because Plaintiffs' [TVPRA] claims are not 'indisputably time-barred' on the face of the complaint"). The parties' disputes regarding the statute of limitations and "continuing violation" doctrine are better saved for later stages of this litigation. *Gaul v. SignalHire LLC*, No. 23-1301, 2024 WL 3652876, at *9 (N.D. Ill. Aug. 5, 2024) (denying motion to dismiss claims based on statute of limitations and noting defendant "is not prejudiced from raising this argument again, once the evidentiary record is more developed"); *Doe v. Radisson Hosp., Inc.*, No. 23-CV-1456, 2026 WL 1399617, at *7 (W.D. Tex. May 19, 2026) (resolving, on summary judgment, whether continuing violation doctrine applies to TVPRA, as matter of first impression).

Wyndham also asks that "[i]f the Court is not inclined to dismiss Plaintiff's TVPRA claim," that it "require that Plaintiff be required to provide a more definite statement." (Filing No. 39 at 18 n.5; Filing No. 42 at 5).[5] Federal Rule of Civil Procedure 12(e) provides, "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." A Rule 12(e) motion is appropriate when a pleading is "so vague or ambiguous that the party cannot reasonably prepare a response," Fed. R. Civ. P. 12(e), such as when the pleading "fails to specify the allegations in a manner that provides sufficient notice" to the responding party. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002); *see Clark v. McDonald's Corp.*, 213 F.R.D. 198, 234 (D.N.J. Mar. 3, 2003) (requiring plaintiff to narrow class action pleading to specify which of 3,000 McDonald's franchise

[5] Wyndham's request for a more definite statement, which is embedded in its opening and reply briefs, is also subject to denial for violating Local Rule 7-1(a) ("Motions must be filed separately, but alternative motions may be filed in a single document if each is named in the title. A motion must not be contained within a brief, response, or reply to a previously filed motion, unless ordered by the court.").

locations violated the ADA). For the reasons explained above, A.F.'s Amended Complaint provides Wyndham with sufficient notice of the claims against it, so a more definite statement is not needed.

Further, motions for a more definite statement are "generally disfavored" and are "not to be used as substitutions for discovery," *Moore v. Fid. Fin. Servs., Inc.*, 869 F. Supp. 557, 560 (N.D. Ill. 1994). Wyndham argues that a more definite statement identifying the date of each alleged TVPRA violation is needed before it can respond to the Amended Complaint (Filing No. 42 at 5). These details are better identified through discovery. *See CNH Am., LLC. v. Equip. Direct-USA, LLC*, 2010 WL 1790364, at *2 (C.D. Ill. Apr. 1, 2010) ("A party should not use a motion for more definite statement to obtain factual details or as a substitute for discovery." (citing *U.S. for Use of Argyle Cut Stone Co., Inc. v. Paschen Contractors, Inc.*, 664 F. Supp. 298, 303 (N.D. Ill. 1987))); *see also EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 779 (7th Cir. 2007) ("Most details are more efficiently learned through the flexible discovery process."). "Motions for a more definite statement have been consistently denied where the more detailed information sought by the motion could easily be obtained through discovery." *Lert v. A.C. Nielsen Co.*, No. 92 C 2216, 1993 U.S. Dist. LEXIS 4235, at *2 (N.D. Ill. Apr. 2, 1993) (citation modified).

ESA's and Wyndham's requests for dismissal on statute of limitations grounds are **denied**.

### C. AF's TVPRA Claim Against ESA

The TVPRA, 18 U.S.C. § 1595, creates a civil cause of action for victims of sex trafficking in violation of 18 U.S.C. § 1591. Section 1591 provides:

> (a) Whoever knowingly — (1) in or affecting interstate or foreign commerce . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or (2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or, except where the act constituting the violation of paragraph (1) is advertising, in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act, or that the person has not attained the

> age of 18 years and will be caused to engage in a commercial sex act, shall be punished as provided in subsection (b).

18 U.S.C. § 1591(a).

"Section 1595 creates two kinds of civil liability: perpetrator liability and participant liability." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 552 (7th Cir. 2023). Perpetrator are those who, "with the requisite state of mind, either (1) engaged in one of the listed acts of sex trafficking or (2) benefitted from participating in a venture that engaged in one of those acts." *Id.* at 556.

A participant includes "'whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter,' which includes Section 1591." *Id.* (quoting § 1595).

> Under a theory of participant liability, a plaintiff . . .who is a victim of a criminal violation must allege and ultimately prove that (1) a venture has engaged in an act in violation of Section 1591, (2) the defendant knew or should have known that the venture had violated Section 1591, (3) the defendant participated in that venture, and (4) the defendant knowingly benefited from its participation.

*Id.* at 553. A "venture" that has engaged in an act violating § 1595 need not be a sex-trafficking venture. *Id.* at 554. "[T]he alleged venture can be a '*commercial* venture[]' like running or expanding a business. While a 'venture' can certainly run the gamut from an isolated act of sex trafficking to an international sex-trafficking enterprise, it can also be a business whose primary focus is not on sex trafficking." *Id.* (citation omitted) (emphasis in original) (quoting *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 727 (11th Cir. 2021)). "Participating" under § 1595 likewise does not require direct participation in the sex trafficking. *Id.* at 558–59.

ESA claims that A.F.'s TVPRA claim fails because she: fails to allege she is a victim of sex trafficking; fails to allege ESA participated in a venture that violates § 1591; and fails to allege that ESA knew or should have known that A.F. was trafficked or that sex trafficking in particular occurred at the Extended Stay. The Court addresses each argument in turn.

**1. A.F. as a Victim of Sex Trafficking**

ESA argues, as a threshold matter, that A.F. has failed to adequately plead that she is a victim of sex trafficking (Filing No. 28 at 7–8). ESA contends that the Amended Complaint contains only "boilerplate" allegations that A.F. was "forced" to have sex against her will, she was a "victim of sex trafficking," and that she was trafficked "[b]y means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing." *Id.* at 8 (quoting Filing No. 11 ¶¶ 4–6, 20, 59).

Even if these allegations were not sufficient, though, they are not the only allegations about A.F.'s trafficking (Filing No. 37 at 7). She also alleges, among other things, that: she was "forced to perform commercial sex acts . . . under threats of physical and psychological abuse," (Filing No. 11 ¶ 5), she was "raped, continuously abused physically and verbally, malnourished, psychologically tormented, [and] drugged" while at the Extended Stay, *id.* ¶ 74; she exhibited visible physical "deterioration" including "bruising," *id.* ¶ 75; she was subjected to "physical and verbal abuse occurring in public areas" of the Extended Stay, *id.*; and "loud noises of fighting or emergency" related to A.F.'s abuse "[were] audible to other rooms or guests," *id.* ¶ 76. These allegations, accepted as true, support the reasonable inference that A.F. was a victim of sex trafficking. On reply, ESA contends that more "factual basis" is needed (Filing No. 40 at 9 ("What would staff have observed? How would they have seen 'bruising'? . . . [S]he provides no details of what transpired [in public areas], or whether any specific incident was seen by hotel employees.")). These corroborating details are simply not required at the pleading stage.

In support of its position, ESA primarily relies on *Doe (L.M.) v. 42 Hotel Raleigh, LLC*, 717 F. Supp. 3d 464 (E.D.N.C. 2024). In that case, the court held that the plaintiff did not sufficiently allege she was a victim of "trafficking" because the complaint there "merely state[d]

in conclusory terms that she was 'trafficked,'" and alleged she "'was forced to have repeated visits from sex buyers'" without specifying what type of force was used. *Id.* at 469. A.F.'s allegations are far more detailed than the plaintiff's in *L.M.* A number of other courts have found allegations similar to A.F.'s are sufficient, and so does this Court. *E.g.*, *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 192–94 (E.D. Pa. 2020) (upholding TVPRA claim where plaintiff alleged she exhibited visible signs of injury and staff heard "constant and loud" assaults by trafficker); *T.P. v. Wyndham Hotels & Resorts, Inc.*, No. 21-cv-04933, 2022 WL 17363234, at *8 (S.D. Ohio Dec. 1, 2022) (upholding TVPRA claim where plaintiff alleged visible injuries and that her trafficker openly beat her in front of hotel staff); *Lundstrom v. Holiday Hosp. Franchising, LLC*, No. 22-cv-056, 2023 WL 4424725, at *8 n.3 (D.N.D. May 22, 2023); *K.B. v. Inter-Cont'l Hotels Corp.*, No. 19-cv-1213, 2020 WL 8674188, at *5–6 (D.N.H. Sept. 28, 2020) (upholding TVPRA claim where plaintiff alleged extensive visible injuries, and a severe act of violence by trafficker against victim that caused damage to furniture which hotel noticed); *A.W. v. Red Roof Inns, Inc.*, No. 2:21-CV-04934, 2022 WL 17741050, at *7 (S.D. Ohio Dec. 16, 2022) (finding TVPRA claim adequately pled where plaintiff alleged "signs of physical abuse and weight loss"); *T.P.*, 2022 WL 17363234, at *8 (finding TVPRA claim adequately pled where plaintiff exhibited "signs of physical abuse" and "her trafficker openly beat her in the parking lot of the hotel"); *S.Y.*, 519 F. Supp. 3d at 1083 (finding TVPRA claim adequately pled where "Plaintiff displayed clear signs of physical abuse, diminished personal hygiene, submissiveness and inappropriate attire"); *see also Doe (L.M.)*, 717 F. Supp. 3d at 469 (citing several of the above cases "[i]n contrast" to the conclusory allegations in *L.M.*).

**2. <u>Participation</u>**

ESA next argues that A.F. fails to sufficiently allege ESA's "participation" in a venture that violates § 1591 (Filing No. 28 at 9–11). The Seventh Circuit has explained that "participating"

under § 1595 does not require direct participation in the sex trafficking. *G.G.*, 76 F.4th at 558–59.[6] "Participating" is construed liberally so that the civil remedy of § 1595 "does not demand more of the plaintiff than a criminal prosecution demands of the government. 'Participating' does not therefore require more than 'assisting, supporting, or facilitating' a venture that violates Section 1591." *Id.* (citations omitted) (citing *Peyton v. Rowe*, 391 U.S. 54, 65 (1968); 18 U.S.C. § 1591(e)(4)) ("It is the venture that must violate Section 1591, and not the participant."). As an example, "[w]here the participant provides assistance, support, or facilitation to the trafficker through . . . a 'continuous business relationship,' a court or jury may infer that the participant and trafficker have a 'tacit agreement' that is sufficient for 'participation' under Section 1595." *Id.* at 559. "To survive a motion to dismiss, all that is necessary is for a plaintiff to allege such a 'continuous business relationship,' which gives rise to an inference, drawn in the plaintiff's favor, that the civil defendant facilitated the venture's success." *Id.* at 560.

ESA argues A.F. has not established a "continuous business relationship" between ESA and her traffickers because her Amended Complaint lacks details like "how often or for how long" she was trafficked at the Extended Stay and "when, how frequently, or what 'trafficker'" rented the rooms, and because the Amended Complaint does not allege that "her trafficker had any unique dealings with ESA," that "her trafficker ever colluded with – or even interacted with – ESA staff," or that the "room rentals were associated with her trafficking." (Filing No. 28 at 11 & n.7). A.F. responds that she has adequately alleged that ESA provided assistance, support, or facilitation to her traffickers by continuing to rent them rooms for illegal commercial sex (Filing No. 37 at 9).

[6] ESA relies heavily on the Eleventh Circuit's decision in *Doe # 1 v. Red Roof Inns, Inc.*, 21 F.4th 714 (11th Cir. 2021). *Red Roof Inns* is not binding on this Court, and the Seventh Circuit has explicitly declined to adopt the *Red Roof Inns* definition of participation. *G.G.*, 76 F.4th at 562 (finding defendant's reliance on *Red Roofs Inns* "misplaced" and stating only that "*even if* we applied the *Red Roof Inns* definition of 'participation in a venture,'" the plaintiff's claims would still survive dismissal (emphasis added)).

The Court agrees with A.F. ESA construes "participant" too narrowly, demands more than is required at the pleading stage, and asks the Court to ignore reasonable inferences in A.F.'s favor. A.F.'s Amended Complaint alleges that ESA owned, supervised, and operated the Extended Stay during the time of her trafficking, and that ESA exerted this control over the Extended Stay through myriad means including providing training to employees and implementing standards spanning internal operating functions and the external day-to-day functions of staff. (Filing No. 1 ¶¶ 37, 101–14). A.F. alleges she and her traffickers would "frequently" stay at the Extended Stay "for days or weeks at a time," and that the traffickers were the ones who rented the rooms, paying in cash. *Id.* ¶ 71–72, 76. She claims that obvious signs of her sex trafficking and abuse were present while A.F. was at the Extended Stay, and that ESA failed to implement or enforce anti-trafficking policies. *Id.* ¶¶ 76–77, 94–99.

When taking A.F.'s allegations as true and drawing all reasonable inferences in her favor, the Amended Complaint demonstrates that Extended Stay employees/staff regularly interacted with A.F.'s traffickers and facilitated the traffickers' ventures by continuously accepting the traffickers' business and renting them rooms. *See, e.g.*, *K.O.*, 728 F. Supp. 3d at 646 (finding plaintiff adequately alleged participation where plaintiff alleged she was trafficked at motel approximately once per month between 2003 and 2012 and, during this time, defendant failed to train, implement, or enforce anti-trafficking policies at that motel); *J.G. v. Northbrook Indus., Inc.*, 619 F. Supp. 3d 1228, 1236 (N.D. Ga. 2022) (finding plaintiff adequately alleged participation because, among other reasons, she alleged traffickers had previously rented rooms for sex and hotel staff should have known that traffickers were back to engage in sex trafficking with the plaintiff in light of "obvious signs, characteristics, and behaviors" indicating trafficking); *M.A.*, 425 F. Supp. 3d at 971 ("Plaintiff has alleged sufficient facts to show Defendants "participated in

a venture" under § 1595 by alleging that Defendants rented rooms to people it knew or should have known where engaged in sex trafficking.").

The alleged continuous business relationship between ESA's employees at the Extended Stay and A.F.'s traffickers is readily distinguishable from cases of "mere passive nonfeasance" or "arm's length, passive, and largely indifferent," *G.G.*, 76 F.4th at 563, that do not rise to the level of participation. In those types of cases, the interactions between the defendant and the criminal were so cursory, routine, and detached that they would not amount to "participation," even when construed liberally. *Compare Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) (finding that victims of an ISIS terror attack could not sue Facebook, Twitter, or Google, even though ISIS recruited on social media, because the platforms' "relationship with ISIS and its supporters appears to have been the same as their relationship with their billion-plus other users: arm's length, passive, and largely indifferent"); *and Doe 1 v. Apple Inc.*, 96 F.4th 403, 414 (D.C. Cir. 2024) (finding former cobalt miners from the Democratic Republic of Congo did not allege Apple, Alphabet, Dell Technologies, Microsoft, or Tesla's "participation" in labor trafficking venture by merely participating in the global cobalt supply chain); *with G.G.*, 76 F.4th at 563–64; *Doe 1 v. Deutsche Bank Aktiengesellschaft*, 671 F. Supp. 3d 387 (S.D.N.Y. 2023) (finding plaintiff plausibly alleged Deutsche Bank "participated" in Jeffrey Epstein's sex trafficking venture by concealing deliveries of cash, failing to report suspicious activity, structuring payments to avoid authorities, and failing to implement required risk oversight); *and Fleites v. MindGeek S.A.R.L.*, 801 F. Supp. 3d 1011, 1036–37 (C.D. Cal. 2025) (finding plaintiff plausibly alleged Visa's participation in website MindGeek's sex trafficking venture by conducting internal due diligence on MindGeek, receiving complaints from advocacy groups, being placed on a list created by anti-traffickers, learning that

competitor PayPal had cut ties with MindGeek, and learning that MindGeek's business model relied in part on trafficking-related content).

A.F. is not required to go into great detail about her trafficking at this stage, and she need not allege specific instances of collusion between Extended Stay staff and the traffickers to plead ESA's participant liability. *G.G.*, 76 F.4th at 559 n.15 ("[A] participant defendant need not have committed 'some "overt act" that furthers the sex trafficking aspect of the venture' or have 'associated' with the sex trafficker 'for the purpose of furthering the sex trafficking.'" (quoting *M.A.*, 425 F. Supp. 3d at 968–69)). A.F. has adequately alleged ESA's participation under the TVPRA.

**3. <u>Knowledge</u>**

ESA lastly contends that the Amended Complaint fails to adequately allege that ESA "knew or should have known" that the venture in question violated § 1591. 18 U.S.C. § 1595. "This is a negligence standard," so a plaintiff must allege "at least constructive knowledge." *G.G.*, 76 F.4th at 555 n.9. ESA argues that the Amended Complaint fails to satisfy the TVPRA's knowledge requirement because it fails to allege that ESA knew about A.F.'s trafficking in particular, or about sex trafficking as opposed to another crime like prostitution.

**a. <u>Knowledge of A.F.'s Trafficking</u>**

ESA contends that a complaint must establish "'that the defendant knew or should have known about the trafficking of the plaintiff in particular – not about trafficking occurring on the premises in general.'" (Filing No. 28 at 11 (quoting *Doe #9 v. Wyndham Hotels & Resorts, Inc.*, No. 19-CV-5016, 2021 WL 1186333, at *1 (S.D. Tex. Mar. 30, 2021))). As A.F. notes in her response, ESA is incorrect as a matter of Seventh Circuit law. The Seventh Circuit expressly rejected ESA's position in *G.G. v. Salesforce.com, Inc.*, stating that ESA's proposed reading of § 1595 "goes two bridges too far." 76 F.4th at 556; *id.* at 548 ("More specifically, we reject

defendant's arguments . . . that a participant must have had constructive knowledge of the *specific* victim of sex trafficking, the civil plaintiff." (emphasis in original)).

Although § 1595 requires more than a defendant's "aware[ness] of sporadic sex trafficking in low-budget hotels generally to show constructive knowledge" of a venture, "the statutory text does not require allegations and ultimately proof that the defendant knew or should have known of the specific victim who has brought the civil action." *Id.* at 558. The Seventh Circuit held, in plain terms, "[t]o state a claim under Section 1595, a plaintiff needs to allege plausibly that the defendant had constructive knowledge that a venture *generally* has violated Section 1591. *Knowledge of the specific victim, let alone knowledge of her identity is not required*." *Id.* (internal citation omitted) (first emphasis in original) (explaining that requiring knowledge of the specific victim would severely undermine § 1595 and mean that "the larger the sex-trafficking venture, the less likely a victim would be able to prove sufficient knowledge. Nothing in the statutory text requires such an odd result."); *see K.O.*, 728 F. Supp. 3d at 644 ("The focus is not on whether the defendant had knowledge of the specific plaintiff's experience, but instead on whether the defendant had constructive knowledge that the specific venture violated § 1591." (citing *G.G.*)).

The *G.G.* court did, however, explain that in cases that "involved the trafficking of only one victim," a plaintiff may need to show knowledge of her trafficking in particular, because when there is only one victim, "knowledge of the specific victim goes hand-in-glove with knowledge of the 'venture.'" 76 F.4th at 557 (citing as examples of single-victim ventures, *Lundstrom*, No. 21-cv-619, 2021 WL 5579117, at *1–2 (D. Colo. Nov. 30, 2021), and *B.M. v. Wyndham Hotels & Resorts, Inc.*, No. 20-cv-656, 2020 WL 4368214, at *5–6 (N.D. Cal. July 30, 2020)).

AF's Amended Complaint references trafficking at the Extended Stay beyond her own trafficking (Filing No. 11 p. 23 ¶ 84(a) (listing review from June 2012 mentioning prostitutes)).

But even assuming the Amended Complaint alleges that she was the single victim of her traffickers, she has adequately alleged that ESA knew or should have known about her trafficking. In addition to alleging that ESA failed to implement or enforce policies to combat the known problems of sex trafficking, and that Extended Stay staff observed the obvious "red flags" of her sex trafficking—including cash payments, signs of drug use, large numbers of condoms, loud noises, and non-stop foot traffic to A.F.'s room—A.F. specifically alleges that she saw the same Extended Stay staff on multiple occasions, and that those staff witnessed her physical deterioration, bruising, and public verbal abuse. *Id.* ¶¶ 51–52, 75–77, 93–100. These allegations are at least sufficient to plausibly allege ESA's actual or constructive knowledge of A.F.'s sex trafficking. *See M.A.*, 425 F. Supp. 3d at 967 (finding similar allegations sufficient to allege constructive knowledge); *T.P.*, 2022 WL 17363234, at *9 (same).

**b. <u>Knowledge of Sex Trafficking</u>**

Finally, ESA argues that the Amended Complaint fails to adequately allege that ESA had actual or constructive knowledge of sex trafficking, as opposed to prostitution or other criminal conduct (Filing No. 28 at 12). Similar to its earlier arguments about A.F.'s status as a "victim," ESA argues that A.F. offers nothing more than "boilerplate" allegations that she was forced to engage in commercial sex acts and "stops short of claiming what ESA staff actually observed." *Id.* at 13. ESA asserts that A.F.'s allegations about her visible signs of physical abuse and public verbal abuse are insufficient because they are unsupported by "specific facts." *Id.* For the reasons already explained in this Order, the Court finds that A.F.'s allegations, among others, that she saw the same staff on several occasions, that she appeared physical deteriorated and had bruising, that she was subjected to physical and verbal abuse in public areas of the Extended Stay, and that her abuse was "audible to other rooms and guests," (Filing No. 11 ¶¶ 75–76), are sufficient at this preliminary stage to allege ESA had actual or constructive knowledge that A.F. was forced to engage in

commercial sex acts by "means of force, threats of force, fraud, coercion" or a combination thereof. 18 U.S.C. § 1595; *see A.B. v. Extended Stay Am. Inc.*, No. 22-cv-5939, 2023 WL 5951390, at *6 (W.D. Wash. Sep. 13, 2023) ("In cases where courts found a plaintiff to have adequately stated a TVPRA beneficiary claim as against a hotel, the plaintiff typically alleges that they exhibited some external indicator of physical distress that would have been obvious to hotel staff had they not been negligent or that traffickers previously trafficked victims at the same hotel.").

For the reasons explained above, ESA's Motion to Dismiss is **denied**.

**D. <u>AF's TVPRA Claim Against Wyndham</u>**

A.F. alleges Wyndham is liable under the TVPRA both as a perpetrator and participant, and that Wyndham can further be held vicariously liable for the actions of its franchisees, the Baronas. Wyndham contends that A.F. has failed to adequately allege a plausible TVPRA claim against Wyndham under either a perpetrator, participant, or vicarious liability theory. The Court begins with Wyndham's vicarious liability theory for the conduct of its alleged agents, the Baronas.

Wyndham argues, as an initial matter, that "[i]f this Court finds Plaintiff failed to adequately plead her TVPRA claim against [the Baronas], it should find Plaintiff has failed to plead vicarious liability . . . against the Wyndham Defendants." (Filing No. 39 at 30). However, the Baronas have not moved to dismiss the claims against them, and Wyndham does not argue that those claims are deficient. The Court will not craft Wyndham's arguments for it. *Horne v. Elec. Eel Mfg. Co., Inc.*, 987 F.3d 704, 727–28 (7th Cir. 2021). This perfunctory and undeveloped argument is therefore waived. *M.G. Skinner & Assocs. Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017).

Wyndham next argues that A.F. has failed to allege an actual agency relationship between Wyndham and the Baronas. Wyndham claims that its enforcement of "brand standards" is typical in all franchise relationships and, indeed, required for Wyndham to maintain its trademarks.

Wyndham further argues that it, like other franchisors, does not exercise "routine, daily supervision and management" of its franchised locations, including the Super 8 (Filing No. 39 at 31). A.F. responds that although a franchise relationship alone does not establish an agency relationship, franchisors may still be held vicariously liable for their franchisees (Filing No. 41 at 22–23). A.F. then cites several cases in which other district courts have found that allegations similar to A.F.'s plausibly alleged agency, and thus vicarious liability, for franchisors under the TVPRA.

"There is generally a split of authority among courts as to 'whether state common law or federal common law applies to the question of whether a party can be held indirectly liable under the TVPRA based on an agency relationship.'" *K.O.*, 728 F. Supp. 3d at 649. This question appears to be one of first impression in this district, and neither A.F. nor Wyndham addresses it in their briefs. Indiana courts have previously cited to the Restatement of Torts in discussing franchisor vicarious liability, *Whitten v. Ky. Fried Chicken Corp.*, 570 N.E.2d 1353, 1356 (Ind. Ct. App. 1991), so the Court finds that its analysis would be largely the same under either federal common law or Indiana state law and therefore applies Indiana law. *See K.O.*, 728 F. Supp. 3d at 649 (finding that federal common law is substantially the same as Michigan law, and applying Michigan law).

"'Franchisor liability' is a fairly undeveloped area of law in Indiana," but the few cases to have addressed the issue agree that "liability hinges on whether the franchisor 'controls' the franchisee." *Dubois v. Kepchar*, 889 F. Supp. 1095, 1101 (N.D. Ind. 1995) ("[T]he question whether one party acts as another's agent distilled to its essence is whether the principal has a right to control the agent. . . . [T]here must be evidence that the franchisor had some degree of control (whether or not actually exercised) over that activity."); *Whitten*, 570 N.E.2d at 1356 ("The amount of control sufficient to impose liability must consist of something more than a general right to make suggestions or recommendations or to order the work stopped or resumed." (citation

modified)) (reversing summary judgment for franchisor because franchisor's authority to require franchisee's "strict compliance" with standards for deep fryers created a triable issue as to franchisor's vicarious liability for injuries caused by franchisee's deep fryer).

A.F. alleges that Wyndham "owns, supervises, manages, controls, [and] operators" the Super 8 (Filing No. 11 ¶ 28). She claims that although the Baronas were the "boots on the ground," Wyndham "was directly involved in and exercised day-to-day control over operations of the Indianapolis Super 8." *Id.* ¶ 63. And in addition to alleging that Wyndham exercises control over the Super 8 through enforcement of its franchise agreement and other typical means of franchisor control, *id.* ¶¶ 101–03, 105, 114, she specifically alleges Wyndham: requires its branded properties to use a property management system that is linked to its corporate network and data center for receiving reservations and processing credit card transactions, among other things; exercises "day-to-day control" through implementation of "centralized corporate systems, training, policies, and brand standards," some of which specifically bar the use of strategies known to combat human trafficking; exercises "significant control over the employment decisions" of its branded properties; "promulgate[s] policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions"; offers training to hotel operators and franchisees; and creates and promulgates policies relating to employee training, including training related to human trafficking, but fails to mandate those trainings "on any significant scale" or at the Indianapolis Super 8. *Id.* ¶¶ 104, 106–13.

Taken together, these allegations are sufficient to allege a plausible actual agency relationship between Wyndham and the Baronas. And although Wyndham denies that it exerts the level of control alleged (Filing No. 39 at 31), "[b]ecause of [Wyndham's] tactical choice to move

to dismiss, we treat [A.F.'s] allegations as true." *G.G.*, 76 F.4th at 549; *see T.S. v. Wyndham Hotels & Resorts, Inc.*, No. 23-CV-2530, 2024 WL 3927382, at *5–6 (D. Minn. Aug. 23, 2024) ("Wyndham protests that everything T.S. has alleged is true of every franchisor-franchisee relationship in the hotel industry . . . . [and necessary] to retain the protection of their trademarks under the Lanham Act. But this matter is before the Court on a motion to dismiss. The Court has no idea what terms are common in franchisor-franchisee agreements, nor what terms must be included in such agreements if franchisors are not to lose legal protection of their trademarks. Moreover, Wyndham's arguments, even if true, are largely irrelevant. If the control that Wyndham exercised over SHI created a principal-agent relationship, then so be it. It does not matter why Wyndham exercised such control, nor does it matter whether other franchisors exercised similar levels of control over their franchisees." (footnotes omitted)); *cf. Clem v. Steveco, Inc.*, 450 N.E.2d 550, 555–56 (Ind. Ct. App. 1983) ("[P]reliminary disposition of the question of the amount of control a franchisor retains is generally inappropriate on a motion to dismiss . . . because the question commonly presents a question which is not addressable by a T.R. 12(B)(6) motion.").

Recently, several district courts across the country, applying analogous agency definitions, have found similar allegations to suffice at the pleadings stage. *E.g.*, *R.K. v. Choice Hotels Int'l, Inc.*, No. 25-1661, 2025 WL 2935249, at *9 (E.D. Pa. Oct. 14, 2025) *A.B. v. Wyndham Hotel & Resorts, Inc.*, No. 24-1588, 2025 WL 1920417, at *5–6 (M.D. Pa. July 11, 2025); *B.T. v. G6 Hosp., LLC*, No. 24-cv-4147, 2025 WL 2781131, at *12 (S.D. Ohio Sep. 30, 2025); *M.S. v. G6 Hosp., LLC*, No. 24-4011, 2025 WL 2781214, at *10–11 (S.D. Ohio Sep. 30, 2025); *Doe (L.M.) v. 42 Hotel Raleigh, LLC*, No. 23-CV-235, 2024 WL 4204906, at *9 (E.D.N.C. Sep. 16, 2024); *G.M. v. Choice Hotels Int'l, Inc.*, 725 F. Supp. 3d 766, 782–83 (S.D. Ohio Mar. 25, 2024); *C.T. v. Red Roof Inns, Inc.*, No. 22-cv-834, 2023 WL 3510879, at *3 (M.D. Fla. Mar. 11, 2023); *J.M. v. Choice*

*Hotels Int'l, Inc.*, No. 22-672, 2022 WL 10626493, at *5 (E.D. Cal. Oct. 18, 2022). The Court is persuaded by this weight of authority that A.F.'s allegations are sufficient at this preliminary stage.

The cases cited by Wyndham (Filing No. 39 at 31–33) are distinguishable because they involved far fewer indicia of control, were decided on summary judgment, and/or applied distinguishable state law. *See, e.g.*, *Doe (G.N.C.) v. Uniquest Hosp., LLC*, No. 23-cv-7980, 2024 WL 4149251, at *6 (S.D.N.Y. Sep. 11, 2024) ("The *only* allegation with any factual content is the assertion that . . . [the franchisor] 'exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate [the hotel].' Under New York law, a franchisee is generally not the agent of a franchisor." (emphasis added)); *Burnette v. Hilton Franchise Holdings LLC*, No. 2021 WL 118924, at *8 (D.N.J. Jan. 13, 2021) (finding on summary judgment that enforcement of branch standards, absent evidence of "day-to-day control" that franchisee was not an agent of franchisor); *Muminov v. Muniraj Enters., Inc.*, No. 11-cv-969, 2012 WL 760638, at *2 (M.D. Fla. Mar. 8, 2012) (finding on summary judgment that "[m]ere use of a franchisor's trademark is insufficient to establish vicarious liability"); *see also T.S.*, 2024 WL 3927382, at *6 n.6 (distinguishing other cases cited by Wyndham for similar reasons).

Because A.F. has alleged a plausible TVPRA claim against Wyndham under a vicarious liability theory involving actual agency, the Court need not, and does not, address Wyndham's remaining arguments as to A.F.'s other theories of liability, including vicarious liability as an apparent principal, direct participant liability, or perpetrator liability. "As long as a discernable legal theory plausibly provides a remedy for a claim, a motion to dismiss that claim must be denied, even if the complaint sets forth a host of alternative theories that fail." *In re Surescripts Antitrust Litig.*, 608 F. Supp. 3d 629, 640 (N.D. Ill. 2022); *see Sojka v. Bovis Lend Lease, Inc.*, 686 F.3d 394, 399 (7th Cir. 2012) ("One claim supported by multiple theories does not somehow become multiple

claims."). "Where a plaintiff states a plausible claim for relief under one discernable legal theory, 'we start and end there." *Signal*, 136 F.4th at 724 (quoting *Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 587 (7th Cir. 2021) and *id.* at 589 ("With a viable agency claim on its actual authority theory, [the plaintiff's] complaint moves forward at this pleading stage. In reaching this result, we need not and do not reach [the plaintiff's] apparent authority and ratification theories of agency liability.")). Because A.F. has plausibly alleged a TVPRA claim against Wyndham, Wyndham's Motion to Dismiss is **denied**.

## IV. CONCLUSION

For the reasons explained in this Order, ESA's Motion to Dismiss (Filing No. 27) is **DENIED** and Wyndham's Motion to Dismiss (Filing No. 38) is **DENIED**.

BRE/ESA Properties, LLC, is not a named defendant in the Amended Complaint. Accordingly, the **Clerk is directed** to terminate BRE/ESA Properties, LLC, from the docket as a defendant.

**SO ORDERED.**

Date: 9/29/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Penny L. Barrick
Babin Law, LLC.,
penny.barrick@babinlaws.com

Mallory T. Biblo
DLA Piper LLP US
mallory.biblo@us.dlapiper.com

Erin A. Clancy
Kightlinger & Gray, LLP
eclancy@k-glaw.com

Benjamin J. Crawford
TUCKER ELLIS LLP
benjamin.crawford@tuckerellis.com

Joseph Gregory Eaton
BARNES & THORNBURG, LLP (Indianapolis)
joe.eaton@btlaw.com

J. Taylor Kirklin
Barnes & Thornburg LLP
taylor.kirklin@btlaw.com

Lara K. Langeneckert
Barnes & Thornburg LLP
lara.langeneckert@btlaw.com

Chelsea R. Mikula
Tucker Ellis LLP
chelsea.mikula@tuckerellis.com

Patrick Bryant Moore
Weinberg, Wheeler, Hudgins, Gunn and Dial
pmoore@wwhgd.com

Catherine Moussa
Weinberg Wheeler Hudgins Gunn & Dial
cmoussa@wwhgd.com

Thomas E Rosta
Metzger Rosta LLP
tom@metzgerrosta.com

David Sager
DLA Piper LLP (US)
david.sager@us.dlapiper.com

Taylor Sorilla
DLA Piper LLP (US)
taylor.sorilla@us.dlapiper.com

Joseph N. Williams
Johnson Jensen Williams, LLP.
joe@jjwlawyers.com